FILED
2026 Sep-24 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TAVARA JAPREE GISSENDANNER,** | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **2:23-cv-8043-EGL** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

Petitioner Tavara Gissendanner is currently serving a sentence of 480 months for conspiring to possess with intent to distribute 500 grams or more of methamphetamine and one or more kilograms of heroin. *See* CR Doc. 1 at 1–2; 199 at 16.[1] Before the Court is his motion to vacate, alter, or amend his sentence under 28 U.S.C. § 2255. Docs. 1, 2. He argues that his sentence should be vacated, altered, or set aside because it violates his Sixth Amendment right to effective counsel. *See generally* Doc. 2. For the reasons set forth below, the Court **DENIES** his motion. The Court also **DENIES** Petitioner's request for an evidentiary hearing and **DENIES** a certificate of appealability.

[1] "Doc." citations refer to docket entries in Gissendanner's civil case, 23-cv-8043; "CR. Doc." citations refer to docket entries in Gissendanner's criminal case, 19-cr-461.

## BACKGROUND

### I. Pretrial Proceedings

On August 29, 2019, a federal grand jury charged Tavara Japree Gissendanner of conspiracy to possess with intent to distribute 500 grams or more of methamphetamine and one or more kilograms of heroin. CR Doc. 1. The indictment also charged Isaiah Thomas and Adrienne Lee as Gissendanner's co-conspirators. CR Doc. 1. A superseding indictment in May 2020, added Tridine Lawson and Annethia Anderson as a co-conspirators. CR Doc. 78.

Before trial, Lawson and Lee pleaded guilty and Anderson agreed to pretrial diversion. CR. Docs. 127, 135, 155. The factual bases of the plea agreements indicated that Lee and Lawson conspired with Gissendanner to possess and distribute heroin and methamphetamine. CR. Docs. 127, 135. All three women testified at Gissendaner and Thomas's joint trial.

### II. Testimony at Trial

***Darrell Haynes.*** Darrell Haynes (Darrell) testified that around 2009 or 2010, he and Gissendanner were incarcerated at the Kilby Correctional Facility, where they became friends. CR Doc. 160 at 198-200, 202. Darrell explained that, following their release from prison, from 2013 to 2015, he and Gissendanner regularly travelled across the state to visit one another and "party" together "in the club." *Id*. 201-03.

At some point after 2015, Darrell said that he became aware that Gissendanner had returned to prison. *Id*. at 205-06. He testified that in early 2019, Gissendanner reached out to him through Facebook and encouraged him to pick up drugs from an unidentified woman, and to deliver them to a man named "Baker Boy." *Id*. at 206, 209-16. Subsequent testimony indicated that the woman was Adrienne Lee. *See id*. at 235-37, 247; CR Doc. 159 at 194-95. Darrell testified that he agreed to pick-up and deliver the drugs. CR Doc. 160 at 212. He also testified that Gissendanner had sent him a picture of himself from inside prison. *Id*. at 233-34.

***Lieutenant Hayes.*** Unbeknownst to Gissendanner and Darrell, however, Baker Boy was a confidential informant for Lieutenant Paul Hayes of Alabama Law Enforcement Agency and Special Agent Anthony Williams of the Department of Homeland Security. *See* CR Doc. 159 at 140; *see also* CR Doc. 160 at 216. In fact, Lieutenant Hayes testified that the deal between Darrell and Baker Boy was actually a controlled buy-bust operation, orchestrated by himself and Special Agent Williams of Homeland Security. CR Doc. 159 at 140-41. Consequently, when Darrell attempted to sell heroin to Baker Boy in April 2019, he was arrested. *Id*. at 140.

Lieutenant Hayes recounted that, following his arrest, Darrell told the investigators that he was willing to cooperate with their investigation, and identified the sources of his heroin as Adrienne Lee and "a black male" named "T.J.," who he

said was "incarcerated in an unknown facility in the Alabama Department of Corrections." *Id*. at 141-42.

Lieutenant Hayes explained that the agents directed Darrell to contact T.J. by text message and telephone to set up a deal for nine ounces of heroin, which T.J. indicated would take place at a McDonald's restaurant in Millbrook, AL. *Id*. at 144, 149. On April 10, Lieutenant Hayes and other agents accompanied Darrell to the McDonald's in Millbrook, where Darrell picked up two kilos of cocaine, nine ounces of heroin, and some methamphetamine from Annethia Anderson. *Id*. at 152-55.

Next, Lieutenant Hayes said, the agents accompanied Darrell to a "controlled delivery" of the heroin, where they arrested Gissendanner's co-defendant, Isaiah Thomas. *Id*. at 182, 187. Lieutenant Hayes said that the agents then instructed Darrell to meet with Lee and to give her a $15,000 cash payment for the drugs he had acquired from Anderson at the McDonald's in Millbrook. *Id*. at 194-95.

According to Lieutenant Hayes, Darrell arranged another drug deal with T.J. in May 2019, under the agents' supervision. *Id*. at 211-12. Lieutenant Hayes explained that T.J. instructed Darrell to travel to Montgomery, Alabama, where Darrell would pick up a pound of heroin from an unidentified woman. *Id*.

Lieutenant Hayes recounted that he and other agents accompanied Haynes to the pick-up, and that after Haynes acquired the heroin, they arrested the woman, who they later identified as Tridine Lawson. *Id*. at 213-214. The agents also arrested Lee

and Anderson. *See id*. at 141-42; *see also* CR Doc. 161 at 60-61. All three women testified at Gissendanner's trial.

***Annethia Anderson.*** Anderson testified that she had worked for the Alabama Department of Corrections from 2011-2014, and that she knew Gissendanner from his time incarcerated at Draper Correctional Institution. CR Doc. 161 at 39-40. Following his incarceration at Draper, she explained, Gissendanner had contacted her on Facebook under the name T.J. *Id*. at 41. The two remained intermittently in contact, and he ultimately asked her to deliver a package to a McDonald's in Millbrook. *Id*. at 42, 50-52. She delivered the package. *Id*.

***Adrianne Lee.*** Lee testified that she had come to know Gissendanner through her cousin, who was incarcerated with him. CR Doc. 161 at 9. Lee said that they had exchanged video calls while he was in prison and that he had once sent her a picture of his ID. *Id*. at 14-15. She identified Gissendanner as T.J. at trial. *Id*. at 10. She said that, after meeting one another, she and T.J. began communicating by cellphone and developed a romantic relationship, *id*. at 13-14, and that he later asked her to deliver packages and retrieve money on his behalf, *id*. at 15-16.

***Tridine Lawson.*** Lawson testified that she had known Gissendanner for more than fifteen years. CR Doc. 160 at 267-68. She said that they were good friends, that she called him T.J., and that he used to call her from prison on a cell phone. *Id*. at

268-69, 270-71. Finally, she recounted that he had asked her to transport a package of drugs to Montgomery. *See id*. at 272.

## III. Gissendanner's Trial Motions

On the first day of the three-day trial, defense counsel raised a *Batson* challenge the government's peremptory strikes of certain jurors. CR Doc. 159 at 99-107. The court denied both challenges. *Id*. On the second day, Gissendanner's defense counsel moved for dismissal of the indictment, arguing that it was "secured through false testimony." *See* CR Doc. 160 at 4-5; CR Doc. 146. The court denied that motion as well. CR Doc. 160 at 23-26.

After the government rested, defense counsel moved for a judgment of acquittal, arguing that the government had failed to introduce sufficient evidence to prove that Gissendanner was the individual making phone calls and directing drug trafficking. CR Doc. 161 at 100. The court denied that motion as well, noting that several witnesses had identified Gissendanner as the man making the calls and directing the trafficking. *Id*. at 101.

## IV. Conviction and Sentencing

The petit jury found Gissendanner guilty of conspiracy to possess with intent to distribute a mixture containing methamphetamine (50 grams or more) and a mixture containing heroin (one kilogram or more) in violation of 21 U.S.C. § 841(a) and (b). CR Doc. 161 at 232; CR Doc. 78.

Section 841 provides an enhanced mandatory minimum of twenty-five years to life for defendants who have previously been convicted of two or more "serious violent felonies." 21 U.S.C. § 841(b)(1)(A). The government asserted that Gissendanner had been convicted of three "serious violent felonies." CR Doc. 144 at ¶3. The government advised defense counsel, however, that Gissendanner may have a right to force the government to prove that his prior convictions had resulted in at least twelve months of imprisonment—a factual predicate to the enhanced mandatory minimum.[2] CR Doc. 160 at 161. Nevertheless, defense counsel stipulated to the length of his imprisonments. CR Doc. at 162. The court sentenced

[2] Prior to the First Step Act (FSA) of 2018, Section 841 provided enhanced mandatory minimums for offenders who had previously committed a "felony drug offense." 21 U.S.C. § 841(b)(1)(A) (2012) (amended 2018). An offense qualified if it involved drugs and could result in imprisonment for more than one year. 21 U.S.C. § 802 (44).

The question of whether a defendant had previously committed a felony drug offense was a question of law, and defendants had no right to submit it to a jury. *United States v. Steed*, 548 F.3d 961, 979-80 (11th Cir. 2008) (quoting *United States v. Marseille*, 377 F.3d 1249, 1257 (11th Cir. 2004)) (citing *Almendarez–Torres v. United States*, 523 U.S. 224 (1998)) ("[T]he government need not … prove beyond a reasonable doubt that a defendant had prior convictions … for purposes of enhancing a sentence.")).

In 2018, the FSA replaced the term "felony drug offense" with two new terms: (1) a prior "serious drug felony" and (2) a prior "serious violent felony." *See* 21 U.S.C. § 841(b)(1)(A) (2018). Both require that "the offender served a term of imprisonment of more than 12 months." *Id*. at § 802(58)-(59). A serious drug felony requires that the offender was released within fifteen years of the present case. *Id*. at § 802(58).

Some courts construed these factual predicates as "elements" that the government must prove beyond a reasonable doubt, and the DOJ adopted a policy of submitting them to a jury. *See United States v. Fields*, 435 F. Supp. 3d 761, 764 (E.D. Ky. 2020), *vacated on other grounds*, 44 F.4th 490 (6th Cir. 2022).

Gissendanner to 480 months in prison, followed by 20 years of supervised release. CR Doc. 199 at 16.

## V. Post-Trial Litigation

Gissendanner appealed to the Eleventh Circuit. *United States v. Gissendanner*, No. 21-11254, 2022 WL 4489912 (11th Cir. Sept. 28, 2022). He argued that the district court should have granted his *Batson* challenge and that "his sentence [was] procedurally unreasonable because the district court inadequately explained the chosen sentence and failed to consider his mitigation evidence." *Id*. at *4, 6. The Eleventh Circuit affirmed the district court's decision.

Gissendanner now asks this Court to vacate, alter, or amend his sentence under 28 U.S.C. § 2255. Docs. 1, 2. He argues that his current sentence violates his Sixth Amendment right to counsel because he received ineffective assistance in the district court. *See generally* Doc. 2. For the reasons discussed below, the court denies his motion. Additionally, the Court holds that Gissendanner is not entitled to either an evidentiary hearing or a certificate of appealability.

## ANALYSIS

Under 28 U.S.C. § 2255, federal prisoners may file a motion to vacate, set aside, or correct a sentence that violates the Constitution. The prisoner bears the burden to show by a preponderance of evidence that his sentence is unconstitutional. *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980). Gissendanner alleges that

his sentence is unconstitutional because he received ineffective assistance of counsel in violation of the Sixth Amendment. *See generally* Doc. 2.

To show ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient, and (2) he suffered prejudice as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

For deficient performance, a petitioner must show that his "representation fell below an objective standard of reasonableness." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 688). There is a "strong presumption" that counsel performed reasonably. *Id*. That presumption is even stronger when the conduct of experienced trial counsel is at issue. *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000).

Because lawyers nearly always "could have done something more or something different," "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* at 1313 (citing *Burger v. Kemp*, 483 U.S. 776 (1987)). In other words, petitioners must show that "no competent counsel would have taken the action that his counsel did take." *Id*. at 1315. That is, if any reasonable lawyer would have done what a petitioner's lawyer did, the petitioner cannot establish ineffective assistance. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (citation omitted).

As for prejudice, a petitioner must show "a reasonable probability that, but for [his] counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Gissendanner advances six arguments suggesting that he received ineffective assistance of counsel. *See generally* Doc. 2. None succeed on either *Strickland* prong.

## I. Failure to Make an Adequate *Batson* Challenge

Gissendanner argues that his trial counsel was ineffective because he "utterly failed to argue that … questions posed by the government during voir dire suggested a discriminatory purpose." Doc. 2 at 35. Before addressing his argument, the Court describes the underlying voir dire.

The jury panel at Gissendanner's trial was thirty percent African American, sixty-six percent white, two percent Asian, and two percent unknown. CR Doc. 159 at 17. A computer randomly selected a subset of jurors, including nine who were black, to participate in voir dire. *Id*. at 102.

***Juror 10.*** During voir dire, The court asked the jurors if they were predisposed to believe or disbelieve law enforcement officers "because of things [they] have heard, [or] experiences [they] have had." *Id.* at 57. Juror 10 responded that, "as a black man living in the United States at this time," he did not know whether he could give law-enforcement officers the "benefit of the doubt." *Id*. at 57-58. He explained that he would need more than an officer's "word alone" to credit the officer's

testimony. *Id.* at 87. After additional questioning, however, he stated that he would apply the same credibility standard to a law-enforcement officer as to any other witness. *Id.* at 89.

The Government then asked if any juror's "opinion [had] been changed, whether positively or negatively, as it relates to law enforcement" considering "recent events that have occurred on television." *Id*. at 62. Juror 10 responded that his opinion of law enforcement was bad and had worsened. *Id*.

***Juror 28.*** Juror 28, a black woman, indicated that she knew members of the defense team through her work as a probation officer and her volunteer activities involving correctional facilities. *Id.* at 94-95. She indicated that her volunteer work centered on prison reform. *Id*. at 71. She stated that she had heard that at Bullock Correctional Facility there was a lot of violence and that the facilities were inadequate. *Id*. at 93-94. She also said, however, that she could remain "neutral and detached." *Id*. at 95.

***Batson Challenge.*** The Government used four of its six peremptory strikes against Black prospective jurors, including Jurors 10 and 28. *Gissendanner*, 2022 WL 4489912, at *2. Defense counsel struck two black jurors, which left three black jurors in the venire, one of whom served as an alternate. *Id*. at *3 n.1.

Defense counsel raised a *Batson* challenge to the strike of Juror 10, arguing that, because Juror 10 had ultimately stated that he could evaluate law enforcement

fairly, the government had no basis for striking him. CR Doc. 159 at 99-100. The court denied the challenge, noting that "he said that he dislikes police, that he doesn't give them the benefit of the doubt [and that he] wouldn't believe them because they were law enforcement, and then he changed." *Id*.

Defense counsel also challenged the strikes of Juror 28 and Juror 5, arguing that the "disparity" between the thirty percent black jury pool and the number of black jurors justified an inference of racial discrimination. *Id*. at 102-03. The court denied the challenges without requiring an explanation from the government, noting that Juror 28 had said that she worked in prison reform and believed "awful stuff" was happening in Bullock Correctional facility, and that Juror 5 had raised his hand when asked if anyone had a negative attitude about law enforcement. *Id*. at 103-107. The government noted that it had struck Juror 5 also because it noticed him sleeping during voir dire and because of his views on drug policy. *Id*. at 106.

The crux of Gissendanner's argument is his objection to the government's question about jurors' "attitudes towards law enforcement based upon recent events" ("the current events question"). Doc. 2 at 36. He contends "[i]t is clear" that the current events question "was referring to opinions on law enforcement following the tragedy of George Floyd, an African American individual who was killed in police custody." Doc. 2 at 37. Thus, he argues, the current events question "clearly raised an inference of a discriminatory purpose." Doc. 2 at 36.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson v. Kentucky.*, 476 U.S. 79, 89 (1986). Thus, defendants may challenge a prosecutor's peremptory strikes by presenting "facts sufficient to support an inference" that the strikes are based on race. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 636 (11th Cir. 2000). If a defendant establishes an inference of discrimination, the prosecution must then offer evidence of a race-neutral reason for its strike(s). *Id*. at 636.

To establish a prima facie case of discrimination, defendants may point to a "'pattern' of strikes against black jurors" to establish an inference of discrimination. *Batson*, 476 U.S. at 97. Additionally, questions or statements by the prosecution during voir dire may "support or refute an inference of discriminatory purpose." *Id*. For example, "disparate questioning" of black and white prospective jurors "can be probative of discriminatory intent." *Flowers v. Mississippi*, 588 U.S. 284, 308 (2019) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 331-32 (2003)).

In *Miller-El v. Cockrell*, the Supreme Court held that there was "some evidence of purposeful discrimination" because, whereas the prosecution asked white jurors about the death penalty in "vague terms," it asked black jurors about their views on the death penalty after graphically describing an execution. 537 U.S. 322, 332, 344 (2003). On the other hand, questions that are directed towards all jurors are substantially less probative of discriminatory intent. *See Rivera v. Ring*,

810 F. App'x 859, 865 (11th Cir. 2020) ("The questions and statements made to this panel member during voir dire were no different than any other prospective panel member.").

Prosecutors generally may question jurors about their trust in law enforcement (or lack thereof) without creating an inference of discrimination. *See United States v. Moore*, 651 F.3d 30, 43 (D.C. Cir. 2011) ("[V]iews on law enforcement provided a race-neutral explanation for the prosecution's decision to strike."), *aff'd sub nom*. *Smith v. United States*, 568 U.S. 106 (2013); *United States v. Arnold*, 835 F.3d 833, 842 (8th Cir. 2016) ("[P]otential bias or dissatisfaction with law enforcement by itself was a legitimate reason for the government to strike the two jurors."); *United States v. Alvarez-Ulloa*, 784 F.3d 558, 567 (9th Cir. 2015) (potential distrust of law enforcement may ground a peremptory strike).

Defense counsel's choice not to raise Gissendanner's proposed argument—that the current events question raised an inference of discrimination—was not constitutionally deficient. Gissendanner's proposed argument was meritless, and an attorney's failure to raise a meritless argument generally does not fall below an objective standard of reasonableness. *See Pinkney v. Sec'y, Dep't of Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Gissendaner's proposed argument was meritless because the current events question did not tend to prove that the government's strikes were racially motivated. Unlike the prosecution in *Miller-El*, which disparately directed graphic questions about the death penalty at black jurors, the prosecution in this case directed the current events question to the entire voir dire panel. *See* CR Doc. 159 at 62; *Rivera*, 810 F. App'x at 865 ("The questions and statements made to this panel member during voir dire were no different than any other prospective panel member.").

Additionally, as the government correctly points out, its question "explored an appropriate topic." Doc. 12 at 7. The question had to do with jurors' trust (or lack thereof) in law enforcement, which courts recognize as a valid, race-neutral reason for striking jurors. *See*, *e.g*., *Moore*, 651 F.3d at 43. That remains true despite Gissendanner's contention that the questions forced jurors to "frame their answers by reference of their race." Doc. 2 at 37. Indeed, it is Gissendanner's argument, not the prosecution's neutral questioning, that indulges the "assumption that [potential jurors] of a particular race, because of their race, think alike[.]" *Miller v. Johnson*, 515 U.S. 900, 912 (1995) (internal quotation marks omitted). Had the argument been raised, it would have failed.

And even if Gissendanner's premise that jurors were likely to answer the question differently based on their race was correct, his conclusion that the question therefore suggests purposeful discrimination is not. "Even accepting the premise"

that striking jurors based on "bias against law enforcement … is not race-neutral because African Americans are disproportionately affected by negative interactions with law enforcement," such a strike "does not support a finding of pretext." *United States v. Brown*, 809 F.3d 371, 375-76 (7th Cir. 2016). The Fourteenth Amendment is not violated by "a particular course of action" undertaken "merely 'in spite of[]' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Accordingly, "*Batson* protects against intentional discrimination, not disparate impact." *Brown*, 809 F.3d at 376.

Finally, even if Gissendanner's proposed argument *would* have won the day on his Batson challenge, that does not automatically establish prejudice. *See Jackson v. Herring*, 42 F.3d 1350, 1362 (11th Cir. 1995). Rather, Gissendanner must still show that there is a reasonable probability that a "constitutionally composed" jury would have reached a different verdict at trial. *Id*. And Gissendanner cannot show a reasonable probability that a different jury would have reached a different result, because the evidence against him is overwhelming.

The evidence against Gissendanner is overwhelming largely because, at trial, three of Gissendanner's alleged co-conspirators and one confidential informant testified that he had reached out to them from prison as "T.J." and asked them to transport drugs on his behalf. *Supra* at 2-5. Darrell and Lawson testified that they had known Gissendanner for more than ten years and had considered him a friend.

*Id*. Darrell and Lee testified that Gissendanner had sent them pictures or videos of himself from the phone he was using in prison. *Id*. Anderson testified that she had remained in intermittent contact with him over social media. *Id*. Lee testified that she was romantically involved with him. *Id*. All four identified Gissendanner as the T.J. who was coordinating heroin trafficking, and all four testified that Gissendanner had solicited their help transporting drugs. *Id*.

Gissendanner cannot credibly argue that a different jury would have reached a different result, despite the considerable testimony against him, just because the new jury could have included more black jurors. Accordingly, he cannot establish that his Sixth Amendment right to counsel was violated.

## II. Failure to Make the Government Prove Sentencing Predicates

Gissendanner next argues that his counsel was ineffective because he stipulated that Gissendanner served at least twelve months in prison for three prior convictions—a predicate fact to the enhanced mandatory minimum under 21 U.S.C. § 841(b)(1)(A). CR Doc. 160 at 161-62. Gissendanner argues that his counsel should have required the government to prove that fact beyond a reasonable doubt. See Doc. 2 at 39. He is incorrect for at least two reasons.

First, defense counsel's choice to stipulate the length of his terms in prison was not only not deficient, it was highly reasonable. *See Poole v. United States*, 832 F.2d 561, 564 (11th Cir. 1987) ("It is often wise for counsel to stipulate to … trivial

and easily proven matters.”). Gissendanner’s prior imprisonment is a matter of public record that the government could have easily proven. Contesting it likely would have harmed Gissendanner by bringing to the jury’s attention his distasteful and extensive criminal history. In fact, Gissendanner would be *more* likely to prevail on his ineffective assistance of counsel claim if his defense counsel had done what Gissendanner now proposes and submitted his previous convictions to the jury. *See People v. Moore*, 2020 IL 124538, ¶ 40, 161 N.E.3d 125, 132 (“Given the high risk of prejudice inherent in disclosing defendant’s prior murder conviction, defense counsel’s failure to stipulate to his felon status was objectively unreasonable.”).

Second, and relatedly, even if his counsel should have put the government to its burden, Gissendanner does not show prejudice because he has not even alleged that he did not serve at least twelve months in prison for his three prior convictions. Thus, he has not alleged facts showing a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” *Strickland*, 466 U.S. at 694.

## III. Failure to Investigate

Gissendanner next argues that his defense counsel failed to “investigate and present evidence that proved [he] was not engaged in unlawful activity between April to May 2019.” Doc. 2 at 45. Specifically, he argues that if his defense counsel had investigated his “whereabouts when the phone calls from ‘T.J.’ were made,” that

"a defense could have been mounted … prov[ing] that [he] was unable to make phone calls during certain times of the day." Doc. 2 at 46. To that end, he says that his counsel should have investigated prison logs and asked the prison warden about his whereabouts at the times the calls were made. Doc. 2 at 46. He also claims that his counsel was ineffective because he failed to "investigate the obvious and provide evidence to the jury that proved Mr. Gissendanner was not in possession of the cellphone." Doc. 2 at 46.

Gissendanner's argument carries little weight. "An attorney need not pursue an investigation that would be fruitless." *Harrington*, 562 U.S. at 108. Gissendanner has not explained how the prison logs or the warden's testimony would have demonstrated that he could not have made calls from prison. The implication is that he must have been somewhere in the prison where calls from a contraband cellphone were prohibited or impractical. But, of course, calls from a contraband cellphone in prison are prohibited and impractical in general, and Gissendanner has not explained how it is less likely that he overcame those obstacles in certain locations within the prison than it is that he overcame them in others.

Additionally, defense counsel could have reasonably assumed that evidence regarding Gissendanner's location in the prison would have had little impact on the case. Gissendanner's defense counsel was aware that alleged co-conspirators were likely to testify against Gissendanner because, before trial, Lawson and Lee pleaded

guilty and Anderson agreed to pretrial diversion. *See* CR. Docs. 127, 135, 155. Defense counsel was also aware that the factual bases of the plea agreements indicated that Lee and Lawson conspired with Gissendanner to possess and distribute heroin and methamphetamines. CR. Docs. 127, 135.

Being aware of the likely incriminating testimony against Gissendanner, it was not unreasonable for his counsel to believe that Gissendanner's precise location within the prison was of little importance, and to focus on other aspects of the case. At a minimum, Gissendanner cannot show that "no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315.

As for prejudice, Gissendanner has not shown a reasonable probability that the outcome of the trial would have been different if defense counsel had investigated prison logs or asked the warden about Gissendanner's whereabouts. As discussed, it is not likely that an investigation would have uncovered any evidence supporting Gissendanner's defense. It is even less likely that the prison logs or the warden's testimony would have overcome the testimony against Gissendanner at trial.

Finally, Gissendanner's suggestion that his defense counsel failed to "investigate the obvious and provide evidence to the jury that proved Mr. Gissendanner was not in possession of the cellphone" is frivolous. *See* Doc. 2 at 46. Gissendanner does not say what evidence would have proved that he had no

cellphone. That is likely because there is none. He cannot establish ineffective assistance of counsel on the grounds that his defense counsel failed to convince a jury that something that obviously happened did not happen. *Durr v. Mitchell*, 487 F.3d 423, 438 (6th Cir. 2007) ("Counsel then cannot be faulted for failing to present evidence that apparently does not exist."). Accordingly, Gissendanner has not established ineffective assistance of counsel for failure to investigate.

## IV. Plea Negotiations

Next, Gissendanner argues that his counsel was ineffective because he "failed to properly advise [him] of the pros and cons of accepting or rejecting the plea offered by the Government." Doc. 2 at 50. He argues that the government offered him a plea bargain "of between 10 and 14 years with cooperation. But counsel only relayed the offer … and did not give … advice as to whether or not to accept or reject [it]." Doc. 2 at 51. The government notes "Counsel for the Defendant categorically denies this assertion," citing defense counsel's sworn statement that he "strongly encouraged the defendant to plead guilty." Docs. 12 at 6, 12-1.

Even accepting Gissendanner's allegations as true, he has not established that he received ineffective assistance. First, Gissendanner is not necessarily correct that failing to advise a defendant whether he should plead guilty (as opposed to merely informing him of the plea) falls below an objective standard of reasonableness. *See Tymes v. Sec'y, Fla. Dep't of Corr.*, 2021 WL 4127066, at *4 (11th Cir. Sept. 10,

2021) ("[T]here is no Supreme Court case holding that defense counsel has an obligation to advise defendants to accept a favorable plea."). This Court need not reach that question, however, because Gissendanner cannot show that any lack of advice was prejudicial.

"To prove prejudice in the context of a foregone guilty plea," a defendant must show a reasonable probability that (1) he would have accepted the plea but-for the deficient performance, (2) the court would have accepted the terms of the plea, and (3) the conviction or sentence would have been less than the conviction or sentence that occurred. *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) (citing *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)).

Gissendanner has not shown a reasonable probability that he would have accepted the terms of the plea agreement even if his defense counsel strongly encouraged him to do so. Claims of innocence after trial undermine a defendant's assertion that he would have accepted a plea deal. *Osley*, 751 F.3d at 1224 ("While Osley's denial of guilt surely is not dispositive on the question of whether he would have accepted the government's plea offer, it is nonetheless a relevant consideration."); *see also Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) ("A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt

undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer.").

Gissendanner has maintained his innocence throughout this litigation, including during his sentencing hearing, on appeal, and in the present motion. CR Doc. 199 at 14; *Gissendanner*, 2022 WL 4489912, at *4, 7; Doc. 2 at 32-33. And at his sentencing hearing, he sidestepped responsibility by claiming that he was "used as a scapegoat for some people that got in trouble." CR Doc. 199 at 14.

Accordingly, there is no reason to believe that he would have decided to plead guilty even if his defense counsel had advised him to do so. *See Nelson v. United States*, 2021 WL 1610095, at *4-5 (M.D. Fla. Apr. 26, 2021) (holding that a defendant could not show that he was prejudiced by his counsel's allegedly ineffective plea advice because he "did not accept responsibility and continued to profess his innocence at sentencing, on appeal, and in his Section 2255 motion"). That conclusion is bolstered by the fact that Gissendanner has offered no other evidence suggesting that he would have accepted the government's plea if he had received adequate advice. *See Rosin v. United States*, 786 F.3d 873, 879 (11th Cir. 2015) ("[I]n the absence of any evidence other than [defendant's] own conclusory after-the-fact assertion [that he would have accepted a plea deal]—and given the record evidence contradicting it—we cannot accept that conclusion."). Therefore,

Gissendanner's ineffective assistance of counsel claim regarding his plea negotiations also fails.

## V. Failure to Question Special Agent Williams

Next, Gissendanner argues that he received ineffective assistance of counsel because his defense counsel "fail[ed] to question Agent Anthony Williams regarding the misrepresentations that he made during his grand jury testimony." Doc. 2 at 58. Before addressing his argument, the Court explains the facts underlying it.

According to Gissendanner's motion to dismiss (filed during trial), the August grand jury that initially indicted Gissendanner relied on testimony from Special Agent Williams. *See* CR. Doc. 146; *see also* CR Doc. 159 at 140.

Gissendanner's motion to dismiss asserted that the court should dismiss the indictment because that testimony was inconsistent with (1) the trial testimony of Lieutenant Hayes and (2) the government's discovery disclosures. CR Doc. 146 at 1; CR Doc. 160 at 5. Defense counsel alleged that Special Agent Williams's testimony was inconsistent with Lieutenant Hayes's trial testimony because:

1. Special Agent Williams had testified that Lee gave an interview and confessed to working for T.J., but Lieutenant Hayes testified that Lee had given no such interview or confession.

2. Special Agent Williams had testified that T.J. made calls in a predictable pattern during the day, but Lieutenant Hayes testified to the contrary.

3. Special Agent Williams had testified that agents monitored all their informant's phone calls, but Lieutenant Hayes testimony indicated that there were no recorded calls from T.J.

CR Doc. 146 at 2-4.

Defense counsel argued that the government's discovery disclosures contradicted Special Agent Williams's grand jury testimony because:

1. Special Agent Williams had testified that agents presented a photo array to an informant, but the government's disclosures stated that the informant had seen only a single photo of Gissendanner.

2. Special Agent Williams had testified that T.J. had three contraband cell phones, but the government disclosed evidence of only two phones.

3. The government produced no evidence in discovery supporting Special Agent Williams's testimony that (a) agents presented a photo array to Lee, (b) agents orchestrated a controlled deal involving only an informant and Lee, or (c) Gissendanner lost a contraband phone in prison.

*Id*.

The government informed the court that the presentation to the May grand jury did not involve re-presentation of Special Agent Williams's testimony to the August grand jury, implying that the false testimony was not the basis for the superseding indictment. *See* CR Doc. 160 at 8.

Noting that the May indictment superseded the August indictment, the Court dismissed the motion, but informed defense counsel that it was welcome to call Special Agent Williams as a witness and question him about his grand jury testimony. CR Doc. 160 at 6, 25-26. Defense counsel declined to do so.

Gissendanner asserts that declining to question Special Agent Williams amounted to ineffective assistance of counsel. First, he contends that Special agent

Williams's answers could have been used as evidence supporting his motion for judgement of acquittal. Doc. 2 at 61. Second, he contends that his answers would have revealed that his case "was infected by corruption, thereby creating a much greater burden and hill for the Government to climb in securing a conviction." *Id*. at 61-62.

Gissendanner's judgement of acquittal argument is incorrect. A judgment of acquittal is only appropriate if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court denied Gissendanner's motion for a judgment of acquittal because several witnesses had identified Gissendanner. CR Doc. 161 at 101. No amount of testimony from Special Agent Williams about his grand jury testimony would have changed that fact. Even if Special Agent Williams had admitted to having perjured himself before the grand jury, the court would still have been bound to view the other evidence in favor of the prosecution and conclude that a rational jury could convict Gissendanner.

Gissendanner's corruption argument also fails. Special Agent Williams was not a key witness in the government's case. In fact, he was not a government witness at all. Thus, it is unclear how "impeaching" him with his grand jury testimony would have been fatal to the government's case. Gissendanner may be correct that exposing

the alleged dishonesty of one of the investigators in his case would have undermined the government's credibility to *some* extent, but he is not correct that it would have revealed systemic corruption so fundamental that the jury would likely have disregarded the wealth of corroborated testimony against him.

Accordingly, it was not unreasonable for his defense counsel to allocate its energy to other aspects of his case. *See Waters*, 46 F.3d at 1512 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."). Moreover, because Gissendanner has not shown even a remote possibility that questioning Special Agent Williams would have changed the outcome of his case, he cannot establish that declining to do so was prejudicial. Thus, he cannot establish ineffective assistance of counsel regarding his counsel's choice not to question special agent Williams.

## VI. Failure to File a Motion for a New Trial

Gissendanner next argues that his defense counsel was ineffective because he failed to file a motion for a new trial on the grounds that the evidence presented was not sufficient to support his conviction. Doc. 2 at 63. First, he attacks the witness testimony against him, arguing that it is "abundantly clear from the record that [they] were not credible" because they were all facing prosecution. Doc. 2 at 64. Second, he points out that the government did not introduce Darrell's or Lee's phone into

evidence at trial, despite alleging that T.J. contacted those phones numerous times, relying instead on witness testimony. Doc. 2 at 65.

Again, Gissendanner is mistaken. Under the Federal Rules of Criminal Procedure, a new trial is appropriate if justice requires. FED. R. CR. P. 33(a). If, after weighing the evidence, the court concludes that, "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may … grant a new trial[.]" *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985).

"Defense counsel," however, "need not make meritless motions," *Brewster v. Hetzel*, 913 F.3d 1042, 1056 (11th Cir. 2019), and a motion for a new trial in Gissendanner's case would have been meritless. As discussed, three of Gissendanner's alleged co-conspirators and one confidential informant testified that he had reached out to them from prison as "T.J." and asked them to transport drugs on his behalf. *Supra* at 2-5. Darrell and Lawson testified that they had known Gissendanner for more than ten years and had considered him a friend. *Id*. Darrell and Lee testified that Gissendanner had sent them pictures or videos of himself from the phone he was using in prison. *Id*. Anderson testified that she had remained in intermittent contact with him over social media. *Id*. Lee testified that she was romantically involved with him. All four identified Gissendanner as the T.J. who was

running a heroin trafficking ring from within his prison, and all four testified that Gissendanner had solicited their help transporting drugs. *Id*.

In view of the compelling case against Gissendanner, it was entirely reasonable to believe that the trial court would not find that justice required a retrial, and that filing a motion for a new trial was therefore "a futile act … that would not have gotten [Gissendanner] any relief." *Pinkney*, 876 F.3d at 1297. At the very least, Gissendanner has not shown that no competent attorney would have refrained from filing such a motion.

And he certainly has not shown that even if his attorney had filed the motion that there is a reasonable probability that the court would have granted it. To the contrary, the court's statements at the sentencing hearing demonstrate the opposite. *See* CR Doc. 199 at 15-16 ("You were running this operation; you were the leader of it. The fact that you sit there and say with a straight face that you are not guilty … just demonstrates that you have no remorse for what you have done and, left to your own devices, you would continue to do it."). Therefore, Gissendanner has not established ineffective assistance of counsel regarding his counsel's decision not to file a motion for a new trial.

## VII. Cumulative Effect of Errors

Finally, Gissendaner argues that, even if none of the aforementioned errors are individually enough for ineffective assistance, they cumulatively are. *See* Doc. 2 at 66 (citing *United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002)).

He is incorrect. "[O]nly the effect of counsel's actions or inactions that do meet [the] deficiency requirement are considered in determining prejudice." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1269 (11th Cir. 2012). The only claim he pleads that could even suggest deficient performance involves plea advice, and as explained above, he cannot show prejudice there. Accordingly, he has failed to establish ineffective assistance of counsel under a cumulative error theory.

## VIII. Request For a Hearing and Certificate of Appealability

Gissendanner requests an evidentiary hearing "so that the Court may take evidence and testimony in further support of his claim(s)." Doc. 2 at 66. He has not, however, "allege[d] facts that, if true, would entitle him to relief." *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002). Rather, the record "conclusively show[s] that [Gissendanner] is entitled to no relief." *Id.* at 714 (quoting 28 U.S.C. § 2255(b)). Accordingly, the Court denies his request for a hearing. *See Nelson*, 2021 WL 1610095, at *5 (denying hearing on *Strickland* claim that defendant would have accepted a guilty plea where "the record contradicts Nelson's position that he would

have accepted a guilty plea and not insisted on going to trial but for his counsel's alleged errors").

Similarly, the Court denies Gissendanner a certificate of appealability. Certificates of appealability are available only to prisoners who have "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, a petitioner seeking to appeal a district court's denial of a § 2255 motion on the merits must show that "reasonable jurists could debate" his constitutional claim. *See Miller-El*, 537 U.S. at 336. Reasonable jurists would not debate whether Gissendanner's counsel was constitutionally ineffective; it clearly wasn't. Gissendanner is therefore not entitled to a certificate of appealability.

## IX. Conclusion

Because Gissendanner has failed to establish that his defense counsel was ineffective, his Motion to Vacate, Set Aside, or Correct Sentence (Docs. 1, 2) is due to be **DENIED.** The Court also **DENIES** his request for an evidentiary hearing and **DENIES** a certificate of appealability. Judgment will be entered by separate order.

**DONE** and **ORDERED** this 24th day of September, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE